IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff-Respondent,

v.                                Criminal No. 15-214 MV-SCY

GERALD JAMES VIARRIAL,

     Defendant-Movant.

## AFFIDAVIT OF TRIAL COUNSEL TODD HOTCHKISS

STATE OF NEW MEXICO    )
                              ) ss.
COUNTY OF BERNALILLO   )

I, Todd Hotchkiss, being duly sworn, depose and state that the following is true to the best of my knowledge:

1. I am an attorney. I have been admitted to practice law in the Supreme Court of New Mexico since October 2, 1990, the United States District Court for the District of New Mexico since March 24, 1992, the United States Court of Appeals for the Tenth Circuit since February 10, 1992, the United States Court of Appeals for the Fifth Circuit from March 17, 1995 (lapsed), and the Supreme Court of the United States since May 14, 2001. I have always been in good standing before all of these courts.

2. I graduated from Vermont Law School in 1988. I have always practiced

1

**Government's Exhibit 1**

criminal defense law and represented criminal defendants, which includes trials, appeals, and post-conviction litigation. While a law student I worked in the Alameda County (California) Public Defender Office, the Federal Public Defender for the District of New Mexico, the Vermont Defender General, and the Indiana Public Defender. I worked for and with Timothy M. Padilla in his law firm from 1990-1996. I worked at Frechette & Associates, P.C. in Albuquerque, New Mexico from then to March 31, 2014. On April 1, 2014 I opened my own law office, Todd B. Hotchkiss, Attorney at Law, LLC.

3. I have been handling trial level cases in state and federal court since the early 1990s. I have handled dozens and dozens of cases in the United States District of New Mexico, one in the District of Kansas in Topeka, and one in the Northern District of Florida in Orlando. I have represented defendants in many State District Courts in New Mexico, in Flagstaff, Arizona, Colorado and Iowa.

4. I was appointed in January of 2015 to represent Gerald Viarrial in this case and the case went to trial in December of 2015. Each motion to continue I filed had the approval of Mr. Viarrial. As elaborated on below, we had recently made arrangements to meet with Mr. Viarrial's family after much delay, and that meeting occurred in early December of 2015, and I wanted time to assess the results of that meeting. Also, I had another 1-2 week trial set to begin in early-mid January of 2016 in front of Judge Herrera, which in fact proceeded on to trial at that time. I did not want this case going to trial near the Christmas holidays as I did not believe that was a favorable time. The allegations in this case were very difficult to defend, involving multiple child witnesses,

2

**Government's Exhibit 1**

devastating allegations by children against their father, and would make for an

extremely emotional and dangerous trial for Mr. Viarrial.   I believed any jury would be

sympathetic to the children's testimony, especially near the Christmas holiday which is a

holiday traditionally featuring happy children.   As elaborated on below, I also wanted

some more time to consider information and possibilities I learned in a family meeting in

early December of 2015.   The last motion to continue was unopposed by the

government and not filed because I was not prepared for a very difficult trial; it was filed

for these other reasons.

5.   The charges against Mr. Viarrial involved two basic sets of allegations.   First,

that in 2010 he had pointed a firearm at Ms. Quintana, Ricky Viarrial, and Refugio

Viarrial and threatened to shoot each one.   Second, the later set of allegations, that in

2014 he had put his hand on the throat of his son, Ricky/John Doe 1, had his other hand

raised in a fist, and that by putting his hand and accompanying force onto Ricky's throat

that he had strangled Ricky which constituted serious bodily injury. From the outset,

and especially after reviewing videos of pretrial statements by Mr. Viarrial's children, I

was deeply concerned that any jury would be sympathetic to the children's testimony

against their father, Mr. Viarrial, and find such testimony quite compelling.

6.   The circumstances involving Mr. Viarrial's arrest and subsequent searches of

his two residences revealed that Mr. Viarrial and law enforcement had differing versions

of what had happened.   In other words, what Mr. Viarrial had indicated to me, as he in

fact later testified at trial, the facts were different from what law enforcement said

Government's Exhibit 1

happened.   Also, some of his post-arrest statements, according to law enforcement, showed Mr. Viarrial not being truthful.

7.   The allegations in the case involved many allegations of other acts by Mr. Viarrial which would show he was a bad father, and one who treated his children harshly and with not a lot of love, and was introduced for purposes under Fed. R. Evid. 404(b).   There was extensive pretrial litigation over other acts, and strategic decisions had to be made with consideration of the type of evidence which could be admitted into evidence.

8.   The circumstances involving Mr. Viarrial allegedly pointing a firearm at Ms. Quintana, Ricky and Refugio and threatening to shoot them were approximately 4 years older than the allegations he strangled Ricky.

9.   The circumstances involving assaulting Ricky involved expert testimony by Dr. Hawley, a government expert on strangulation pertaining to whether the evidence that Mr. Viarrial had put his hand on the throat of Ricky constituted serious bodily injury.   I had sought to exclude the testimony of the government's expert witness in pretrial litigation, and was unsuccessful in doing so.   I had filed a response to the government's notice of intent to use Dr. Hawley (Doc.78) and moved to exclude Dr. Hawley's testimony on multiple grounds, including that "the very questionable probative value of the proposed testimony would be substantially outweighed by the danger of unfair prejudice." (Doc.78 at 8-9, 12, 15)   The expert was allowed to testify because of the strong probative value of that testimony not unfairly prejudicing Mr. Viarrial.

**Government's Exhibit 1**

Furthermore, I believe my cross examination of the government's expert witness was effective, and my cross examinations of the children, especially Ricky, were effective in this regard.

10.  The allegations in the charges and in alleged other acts meant a fractured family, one in which determining who to trust was difficult to determine.  I also thought the children in a fractured family would look sympathetic to any jury.

11.  The one alleged victim common to the two sets of allegations was Ricky, John Doe 1.

12.  I engaged an investigator to attempt to investigate the circumstances as best we could.  That investigator, Richard Baca, repeatedly told me that he had placed numerous telephone calls to various family members, including Mr. Viarrial's son Gilbert and his step-son, Nathan Romero.  Nathan Romero's mother is Wanda Quintana.  We did this to try to establish if we could find a way to speak with Ms. Quintana and/or her children, and to find out if possible witnesses existed and to try to find helpful background information.

13.  Mr. Baca reported to me that he had basically gotten the run-around from the calls he had made to try to make arrangements to speak with potential witnesses and sources of information.  Mr. Viarrial wanted to trust Gilbert and Nathan more than it appeared to me we should in part due to the run-around Mr. Baca having with them just to attempt to make arrangements to speak with them.  The longer the delay, the more skeptical and wary I became.

**Government's Exhibit 1**

14.     Gilbert was not alleged to be present during or at either of the two alleged sets of circumstances.    In fact, pertaining to the allegations of Mr. Viarrial strangling Ricky the only alleged people present were Mr. Viarrial's children and Mr. Viarrial. Pertaining to their allegations that Mr. Viarrial pointed a firearm at his children and Ms. Quintana the only alleged people present were the children, Ms. Quintana, Mr. Viarrial, and possibly Nathan Romero, depending on who one believed.    Nathan Romero was alleged by Mr. Viarrial to be present and Refugio Viarrial testified at trial he was present. Thus we wanted to speak with Nathan.    Mr. Viarrial testified at trial that Nathan, after Mr. Viarrial directed everyone to get into a line, went to the truck with the smaller children.

15.     We, Mr. Baca and I, eventually made arrangements to visit and speak with Gilbert and Nathan.    We ultimately succeeded in speaking with both of them at one of Mr. Viarrial's residences where at least Nathan was living.    Also present was Nathan's girlfriend, who represented that she knew a lot about the background circumstances.

16.     Mr. Baca and I believed we had to strategically be careful with what we said and what we asked of Nathan and Gilbert because we did not know to whom they were loyal.    Nathan did not clearly remember whether he was present for the allegations of Mr. Viarrial pointing a firearm at Ms. Quintana, Ricky and Refugio.    He appeared very hesitant to clearly state anything which could be helpful to Mr. Viarrial.    Plus, I did not know if he would relay our conversation to his mother, Wanda Quintana, or not. Neither Nathan nor Gilbert appeared to clearly wish to be involved to assist Mr. Viarrial.

6

**Government's Exhibit 1**

17. Ultimately, we were finally able to arrange a meeting on a Saturday morning and into the afternoon in early December of 2015 with family members of Mr. Viarrial, including his sister, his father, Gilbert and Nathan. That meeting resulted in the discovery of a couple of witnesses who we called as witnesses at trial. My concerns about Nathan and Gilbert remained. We learned information that Mr. Baca and I had to consider for purposes of the trial.

18. An investigation did occur; unfortunately, it did not present much presentable evidence. Mr. Viarrial wished me to present evidence of school records that his children had skipped school. Mr. Viarrial had made statements to his children as evidenced in the discovery and testified to at trial that prior to placing his hand on Ricky's throat he was upset that his children were "ditching" or skipping school. I did not want to present evidence that would make Mr. Viarrial's alleged conduct that day more intentional and knowing that it may otherwise appear to be. Any possible impeachment value of his children for any alleged skipping of school, I viewed to be completely overshadowed by that same evidence showing how knowing and intentional Mr. Viarrial's conduct was. Finally, there was favorable evidence presented relevant to this point. Ricky admitted he quit school without ever having skipped school, which I thought did not ring true.

19. To maintain the possibility of calling Nathan as a witness, I put Nathan on the witness list. Subsequently, the United States sent out an officer to interview Nathan, that conversation was recorded, and a CD of that conversation was provided by the

Government's Exhibit 1

AUSA to me during trial. I listened to that CD that night and all doubts were resolved that Nathan could not be called as a favorable witness by me on Mr. Viarrial's behalf.

20. Mr. Viarrial had expressed multiple times before the suppression hearing and trial that his children would not show up as witnesses against him, and this was one of the reasons he wanted to go to trial. I had told Mr. Viarrial that I had never had that occur in my career and counseled him the reasons I believed they would show up. When his children and Ms. Quintana showed up for the suppression hearing, even though they were not witnesses at the hearing, I told Mr. Viarrial that this is evidence they would show up at trial. Mr. Viarrial continued to assert they would not show up and they only showed up at the suppression hearing because the government had forced them to show up.

21. By the time of the meeting with the family in Pojoaque, my understanding from Mr. Viarrial and confirmed by the family present was that no one had visited Mr. Viarrial while he was in custody at the Cibola County Detention Center up to that point in time. Much like Mr. Baca had reported to me when family members would leave messages for him, the family members told me that they were busy, it was a long way to go to visit Mr. Viarrial, and it just was not important for any of them to take time to visit him. I found this interesting and important to consider in assessing who to believe and what to believe.

22. Mr. Viarrial had denied all along the allegation that he had put his hand on the throat of Ricky and denied that he had attempted to strangle Ricky. The fact that Ricky

8

**Government's Exhibit 1**

had gone to Ms. Duran's, talked to her to seek assistance to get away from his father, and the next day was allegedly attacked by Mr. Viarrial was also a very troubling sequence of events which in my opinion would likely give the allegations additional credibility and weight to any jury.

23. Well before trial, the government and I engaged in plea discussions and resulted in what I believed to be a favorable plea offer to Mr. Viarrial. When attempting to convince Mr. Viarrial to accept the favorable plea offer from the United States, given Mr. Viarrial's prevailing consistent denials of pointing a firearm at Ms. Quintana, Ricky and Refugio and threatening to shoot and kill them and putting his hand on the throat of Ricky, I asked Mr. Viarrial during a visit to CCDC to display on me for Mr. Baca and me to observe what happened in the incident with Ricky.

23. Mr. Viarrial agreed to display on me what he did with Ricky in the presence of Mr. Baca. Mr. Viarrial approached me and put his hand on my shirt collar. We discussed the matter and Mr. Viarrial denied putting his hand on the throat of his son. This had three meanings to me. First, Mr. Viarrial corroborated to me that an incident involving him and Ricky had occurred. Second, this corroboration corroborated the claims of Ricky and other children that an incident had occurred between Mr. Viarrial and Ricky. Third, I told Mr. Viarrial that given the likely emotion surrounding the children's testimony at trial and how compelling such testimony could be that evidence that he had put his hands on Ricky because he was so upset with his son but that he had only put his hands on Ricky's shirt collar and not his throat would be difficult for any jury

9

**Government's Exhibit 1**

to believe. In other words, Mr. Viarrial basically agreed to the allegations of his children concerning an incident with Ricky except for the allegation that he put his hand on Ricky's throat. Nevertheless, Mr. Viarrial wanted his defense to be that he never put his hand on his son's throat.

25. Ricky, Refugio and the other children had provided multiple pretrial statements included in pretrial discovery, and their statements were inconsistent about the allegations of Mr. Viarrial putting his hand on Ricky's throat and whether Mr. Viarrial had affected Ricky's ability to breathe or if Ricky had any trouble breathing. Ricky especially was not definite about what had happened. Indeed, Ricky had indicated, and later testified that he did not have trouble breathing, did not black out and his father did not squeeze his throat after placing a hand on his throat. Indeed, no government witness disagreed that Ricky was not taken anywhere for any medical treatment and there was no need to do so. Meanwhile, Lt. Johnson indicated in discovery that Ricky had told him that Ricky had trouble breathing and blacked out. I asked all possible witnesses about whether Ricky had evidenced trouble breathing or had blacked out, including Johnson on cross exam. I specifically asked Johnson believing that Ricky would eventually testify as he did, contradicting Johnson's testimony and hopefully creating reasonable doubt. These same inconsistencies and uncertainties carried over by necessity to the foundation for the government's expert's testimony.

26. Given Mr. Viarrial's insistence that he had not put his hand on the throat of Ricky, let alone strangled Ricky, I was quite reluctant to put on any witness who would

10

**Government's Exhibit 1**

offer testimony involving Mr. Viarrial having put his hand on Ricky's throat as I was quite reluctant to deal with that duality, that inconsistency in the defense. I believed that I could attack the foundation for that testimony, the foundation that Ricky had trouble breathing or had blacked out, and thus attack the basis for the expert's testimony, maintain consistency in our defense that it had not happened and avoid inconsistency with an expert of our own.

27. I discussed the matter with another attorney and with Mr. Baca. Given the totality of the circumstances, I made the strategic decision to rely on cross-examinations of the children and the government's expert witness and other witnesses, and Mr. Viarrial's possible testimony, to further Mr. Viarrial's defense that he did not put his hand on his son's throat and to not confuse or contradict that defense with the testimony of an expert witness about whether Mr. Viarrial's placement of his hand on the throat of Ricky constituted serious bodily injury. Consequently, I did not present the testimony of an expert witness.

28. Ultimately, Ricky at trial testified that he did not have trouble breathing and did not black out and that his throat was not squeezed when his father put his hand on his throat. I thought I did a very effective cross examination of the government's expert witness. As a matter of fact, I remember when I sat down after my cross examination of the government's expert witness Mr. Viarrial was very happy and told me I had done a good job.

11

**Government's Exhibit 1**

29. I spoke with Mr. Viarrial many times about the risks of underestimating adults assessing credibility to allegations by children that an adult had threatened them or hurt them, and had specifically warned Mr. Viarrial about a jury's likelihood to assess credibility to children who made allegations about their father threatening or hurting them. Mr. Viarrial refused to believe counsel's advisements in this regard to his detriment.

30. I also spoke with Mr. Viarrial about the sequence of events which brought the family circumstances to the attention of law enforcement, particularly Ricky riding a horse to Ms. Duran's to ask her for her assistance to get away from his father and the very next day Mr. Viarrial allegedly attempted to strangle Ricky. I thought that sequence of events would provide the allegations unique credibility for any jury.

31. During jury deliberations, which lasted for almost 5 hours, the jury sent out a note and requested advice as to the meaning of mental faculty, what is included in the meaning of mental faculty, pertaining to jury instruction number 23 and the charge that Mr. Viarrial had strangled Ricky and inflicted serious bodily injury. Given the testimony and the emotional nature of the case and allegations, I believed it was more favorable to Mr. Viarrial to not give the jury something specific. All the parties agreed to have mental faculty to be defined "by the jury in light of its common sense and experience, and the Court did not disagree. The jury wanted something more specific; not giving more to the jury would hopefully provide some basis for reasonable doubt on that charge. I was satisfied with my cross examinations under the circumstances, and

12

**Government's Exhibit 1**

wanted the jury to reach a non-technical decision that the foundation evidence was not there.

32.   Mr. Viarrial decided to testify at trial.   Among his testimony was his denial that he had put his hand on Ricky's neck.   Mr. Viarrial's 3 children, who witnessed Mr. Viarrial assault Ricky by putting his hand on his throat, testified they saw Mr. Viarrial, while angry, put a hand on Ricky's throat.   Mr. Viarrial's version was that no assault had happened; he did not even present a factual basis for a lesser-included instruction. I did not seek any lesser included instructions.   If such an instruction had been given, I would have had to argue against Mr. Viarrial's testimony, which would have been an unreasonable tact to take argue against a client's testimony.

33.   A few weeks after the trial and in early January of 2016, Mr. Viarrial instructed me to file a motion to withdraw as his counsel.   I did so and the Court granted that motion.

34.   This was an extremely difficult and emotional case.   I remember seeing at least one juror sobbing during the trial.

35.   FURTHER AFFIANT SAYETH NAUGHT.

_____
TODD HOTCHKISS

SUBSCRIBED AND SWORN TO before me this 30th day of September, 2019.

13

Government's Exhibit 1

Notary Public

My Commission Expires:

5/4/2021



Official Seal
KRISTIN LEIGH SMITH
Notary Public
State of New Mexico
My Comm. Expires 5/4/21

14

**Government's Exhibit 1**